UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ERICA CHERISE DAVENPORT,

      Plaintiff,                         Civil Action No. 16-11333

              v.                     District Judge STEPHEN J. MURPHY, III
                                      Magistrate Judge R. STEVEN WHALEN


COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

**<u>REPORT AND RECOMMENDATION</u>**

     Plaintiff Erica Cherise Davenport ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #12] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #11] be DENIED.

## PROCEDURAL HISTORY

On September 24, 2012, Plaintiff applied for DIB and SSI, alleging disability as of August 27, 2012 (Tr. 217, 224). Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on July 9, 2014 in Oak Park, Michigan (Tr. 40). Patricia S. McKay, Administrative Law Judge ("ALJ") presided. Plaintiff, represented by attorney Helen Manesia, testified (Tr. 46-83), as did Vocational Expert ("VE") Pauline McEachin (Tr. 83-89). On September 10, 2014, ALJ McKay found Plaintiff not disabled (Tr. 22-35). On February 24, 2016, the Appeals Council denied review (Tr. 4-8). Plaintiff filed suit in this Court on April 12, 2016.

## BACKGROUND FACTS

Plaintiff, born July 6, 1982, was 32 when ALJ McKay issued her decision (Tr.35, 217). She completed one year of college and received a "computer hardware certificate" (Tr. 250). She worked previously as an auditor, cashier, and restaurant worker (Tr. 250). She alleges disability as a result of bipolar disorder, depression, anxiety, panic attacks, and problems of the shoulder, back, and knee (Tr. 249).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

She currently lived with her parents, brother, and 10-year-old daughter (Tr. 46). She stood 5' 4" and weighed 125 pounds (Tr. 47). She was able to perform laundry chores for herself and her daughter (Tr. 48).

Plaintiff attended Michigan State University and Davenport University, where she was a finance major at Davenport (Tr. 49-50). She stopped attending Davenport in the fall of 2013, after her car engine "blew" (Tr. 50-51). Her inability to resume school was due to financial problems (Tr. 51).

Her inventory job, lasting between 2006 and 2012, required her to count products in a store (Tr. 53). The job involved walking bending, squatting, and climbing ladders (Tr. 53). She was a supervisor for three of six years in the inventory position which required her to fill out paperwork, use a computer, and schedule employees (Tr. 54). She stopped working after a "mental[] collapse," characterized by the inability to get out of bed, a poor appetite, and walking off her job (Tr. 56). In 2013, she had self-employment earnings as a cake baker (Tr. 57). She did not make enough to live on baking cakes and sometimes was unable to afford medication (Tr. 58). She also earned some money as a housekeeper (Tr. 59).

Plaintiff sometimes went three to four days without eating (Tr. 63). She was now receiving individual and group therapy (Tr. 63). She received child support payments and sporadic state assistance (Tr. 64). She experienced reading comprehension problems (Tr. 64). She held a valid driver's license but limited her driving to short distances due to her tendency to become flustered (Tr. 65). She did not take public transportation but was able to walk (Tr. 66). She was currently in a romantic relationship (Tr. 67). Her relationship with her mother was strained (Tr. 67). On a typical day, Plaintiff spent long periods playing games on her cell phone (Tr. 68). She had lunch occasionally with the pastor of her church

(Tr. 68).  She was able to care for her personal needs and did not like to be "not clean" due to "a little touch of [Obsessive Compulsive Disorder]" (Tr. 69).  She was able to cook on "good days" (Tr. 70).

Plaintiff experienced back pain radiating into her lower extremities (Tr. 71).  She attended physical therapy previously and currently took Tramadol for the back pain (Tr. 72).  Back surgery had not been recommended (Tr. 72).  She had been diagnosed with a borderline personality disorder (Tr. 72).  She had been advised not to treat the condition of Attention Deficit Hyperactivity Disorder ("ADHD") until the borderline personality condition was "under control" (Tr. 73).  She experienced anxiety since being the victim of a robbery in 2011 (Tr. 73).  She noted that during the perpetrator's trial, his family threatened her (Tr. 74).  She had also experienced sleep disturbances for the past seven years (Tr. 75).  She smoked one-and-a-half packs a day despite experiencing allergy-induced asthma (Tr. 75).  She currently smoked marijuana on an occasional basis to reduce anxiety (Tr. 76).  She opined that she could perform inventory work provided that she was not required to do significant lifting (no more than 30 pounds on an occasional basis) or climb ladders (Tr. 78-79).

In response to questioning by her attorney, Plaintiff reported that she was unable to sit comfortably for long periods (Tr. 79).  She typically sat off to the side of the church during services and experienced panic attacks once or twice a month due to agoraphobic symptoms (Tr. 80).  She had daily crying jags and thoughts of harming herself (Tr. 81-82).  She opined that she was currently incapable of returning to the workforce (Tr. 82).

**B. Medical Evidence**

**1. Treating Sources**

In December, 2011, Plaintiff reported chronic back pain and the inability to gain weight (Tr. 318-320). A December, 2011 imaging study of the thyroid gland was unremarkable (Tr. 312, 326). The same month, an MRI of the lumbar spine showed mild stenosis at L4-L5 and moderate facet arthropathy at L5-S1 (Tr. 313, 328-329). March, 2012 records note the conditions of anxiety, gastroesophageal reflux disease ("GERD"), and possible hyperthyroidism (Tr. 334). April, 2012 psychological treating records note that Plaintiff was appropriately dressed but "nervous, active, [and] scattered" (Tr. 345). She reported daily marijuana use (Tr. 347). Swarn Majajan, M.D. assigned her a GAF of 60[1] (Tr. 348). May and June, 2012 treating records state that Plaintiff was not "better" despite taking psychotropic medication (Tr. 314, 384). She reported that she used marijuana to cope with insomnia and that her attempt to find a job was hampered by a misdemeanor conviction (Tr. 343-344). She discussed personal styling topics and her preference for junk food (Tr. 344). The next month, she acknowledged that she had not filled prescriptions due to financial limitations (Tr. 343). Treating notes state that she appeared psychiatrically "normal" (Tr. 314). In November, 2012, Plaintiff resumed psychiatric treatment (Tr. 342).

---

[1]
A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*").

February, 2013 psychiatric treating records state that Plaintiff thought about hurting herself, but engaged in upper body strengthening exercises (Tr. 340). She denied medication side effects (Tr. 340). She appeared "depressed and angered" (Tr. 341). July, 2013 reports state that Plaintiff was irritable with coherent, relevant speech (Tr. 397). She acknowledged that she had not been taking psychotropic medication due to financial constraints[2] (Tr. 397). August, 2013 records note Plaintiff's report that school was easy, but that her efforts were hampered by the inability to concentrate (Tr. 406). She acknowledged a conviction for bank fraud (Tr. 407). Dawn Reynolds, M.D. assigned her a GAF of 60 (Tr. 407). Dr. Reynolds denied Plaintiff's request for "special accommodations" for her studies, noting that Plaintiff "did not appear to warrant . . . special accommodations" (Tr. 407).

In September, 2013, Plaintiff sought emergency treatment for anxiety after waking up in the middle of the night and seeing three men in her room (Tr. 368). She denied back pain (Tr. 368). She reported that she had run out of psychotropic medication two months earlier (Tr. 368). Counseling records from the same month note that Plaintiff experienced an improved mood (Tr. 394-395). December, 2013 records state that she had discontinue college classes due to lack of transportation (Tr. 393). She was encouraged to attend a job fair (Tr. 393). April, 2014 records note that a pregnancy test was negative (Tr. 372).

March, 2014 counseling records state that Plaintiff sought treatment after a six-month

---

[2] August, 2013 records contained in the transcript pertain to another individual (Tr. 396).

break (Tr. 392). She appeared "hyper" with appropriate dress, good hygiene, and good eye contact (Tr. 392). In April, 2014, Plaintiff denied physical complaints (Tr. 391). She appeared fully oriented and denied suicidal or homicidal ideation (Tr. 409). In June, 2014, Plaintiff told a therapist by telephone that she was "in a crisis" but "calmed down" after a 40-minute talk with the therapist (Tr. 387). The following day, she reported that she was upset after breaking up with her boyfriend (Tr. 388).

Treating notes from the same month state that Plaintiff blamed her mother for her problems (Tr. 422). She denied hallucinations but report suicidal ideation (Tr. 424). She demonstrated adequate impulse control and appeared fully oriented (Tr. 425). Monica Smith, M.D. assigned Plaintiff a GAF of 40[3] (Tr. 425-427). The following month, Plaintiff reported lessened psychological symptoms after taking Klonopin (Tr. 436). Plaintiff was discharged from "inpatient" services the same month with a GAF of 55 (Tr. 451). She was given a "return to work/school date" of July 19, 2014 (Tr. 453). The same month, Plaintiff sought emergency treatment, stating that she intended to commit suicide (Tr. 455). She reported the "stressors" of "no love, no money, no comfort," and loneliness (Tr. 471). Inpatient records noted that "chonic back pain" did "not seem to be an issue" at the time of admittance (Tr. 462, 464). She was discharged with a GAF of 45[4] (Tr. 466). She was advised to continue

---

[3]

A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM–IV–TR* at 34.

[4]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in

with outpatient therapy and remain medication compliant (Tr. 468). She was diagnosed with an "unspecified episodic mood disorder" (Tr. 470).

## 2. Non-Treating Sources

In April, 2013, Nick Boneff, Ph.D. performed a consultative mental examination on behalf of the SSA, noting Plaintiff's allegations of insomnia, depression, anxiety, and back, shoulder, and knee pain (Tr. 350). She reported daily marijuana use to cure insomnia (Tr. 350). She denied suicidal or homicidal ideation and reported that she was able to handle her own finances (Tr. 350-351). She presented with a labile affect and tearful, anxious mood but was "logical, goal directed and organized" (Tr. 351). Dr. Boneff found that Plaintiff was capable of two and three-step tasks despite psychological symptoms and "chronic cannabis dependence" (Tr. 352).

The same month, E. Montasir, M.D. performed a consultative physical examination on behalf of the SSA, noting that Plaintiff appeared "very angry" (Tr. 355). Aside from a limited range of lumbar motion, a physical examination was unremarkable (Tr. 357, 359). He found that Plaintiff was precluded from climbing ropes or scaffolds and was limited to lifting 40 pounds (Tr. 357). He found no limitation in walking, climbing stairs, or manipulative limitations (Tr. 357).

Later in April, 2013, Rose Moten, Ph.D. performed a non-examining review of the

---

social, occupational, or school functioning," such as inability to keep a job. *DSM-IV-TR* at 34.

treating and consultative records, finding that Plaintiff experienced mild restriction in activities of daily and moderate limitation in social functioning and concentration, persistence, or pace due to the conditions of depression, anxiety, a personality disorder, and substance abuse (Tr. 99, 111). She cited the treating and examining records showing adequate grooming and a bright affect (Tr. 98). Dr. Moten found that simple work activity was not precluded (Tr. 102). In June, 2013, Michele Leno, Ph.D., conducting a renewed non-examining review, also found moderate restriction in social functioning and concentration, persistence, or pace (Tr. 127, 140-141).

The same month, Muhammed Ahmed, M.D. conducted a non-examining review of the records pertaining to Plaintiff's physical condition, finding that she could lift 20 pounds frequently and 10 occasionally; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 128). He found that Plaintiff was limited to occasional postural activities but did not experience additional physical limitations (Tr. 129, 133).

### C. Vocational Expert Testimony

VE Pauline McEachin classified Plaintiff's past relevant work as an inventory clerk as semiskilled and exertionally medium[5] (Tr. 84). ALJ McKay then posed the following

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting

question to the VE, describing an individual of Plaintiff's age, education, and work experience with the following limitations:

> [S]he would be able to perform the full range of light exertional work, but she would be limited in other ways. She could be - - she could engage in climbing stairs, ladders, crouching, crawling, kneeling, stooping, bending on a frequent basis, not constant. Her contact with other, such as co-workers, should be limited to occasional. Occasional supervisors, as well. But she should not have contact with the general public. And with the co-workers, I don't want her engaging in any team or tandem work. And I think it'd be best if she were in a low stress environment, which would require that she be able to maintain control over the pace of the work. Self-paced work, like a piecework environment. And that's to minimize stress levels. With just those limitations, could our hypothetical claimant perform the past work? (Tr. 85)

The VE testified that the above limitations would preclude Plaintiff's past work but would allow for the light, unskilled work of an inspector (180,000 jobs in the national economy); general office clerk (80,000); and packager (100,000) (Tr. 85-86) The VE testified further that if the same individual required a sit/stand option, the inspector position numbers would be reduced to 40,000; general office clerk, 50,000; and packager, 30,000 (Tr. 86). She stated that if the postural activities listed above were limited to "occasional," the job numbers would remain unchanged (Tr. 87). She testified that the need to be off task for more than 20 percent of the workday, or, miss at least two days of work each month would preclude all competitive employment (Tr. 87-88). She stated that if Plaintiff's testimony as to the concentrational limitations were fully credited, she would be unable to perform any

_____

objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

work (Tr. 88). She stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") and *Selected Characteristics of Occupations* ("SCO") except for the testimony regarding a sit/stand option which was based on her own professional experience (Tr. 88-89).

### D. The ALJ's Decision

Citing Plaintiff's medical records, ALJ McKay found the severe impairments of "degenerative disc disease with bulging discs of the lumbar spine, bipolar disorder, mood disorder no otherwise specified, borderline personality disorder, dysthymic disorder, impulse control disorder not otherwise specified, and cannabis dependence" but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 25). She found that the conditions of asthma, Vitamin D deficiency, and [GERD] were not "severe" impairments (Tr. 25). The ALJ found that Plaintiff experienced mild restriction in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 26).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [S]he can occasionally climb stairs and ladders, crouch crawl, kneel, stoop, and bend. She can occasionally interact with coworkers and supervisors but can never interact with the general public. She can never participate in team or tandem duties with coworkers. she can work in low-stress environments such that allow her to maintain control over the pace of the work (Tr. 27).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to return to her past

work, she could perform the jobs of inspector, general office clerk, and packager (Tr. 33-34, 86).

The ALJ discounted Plaintiff's allegations of physical limitation, citing Dr. Montasir's observation of a normal gait, stance, and hand grip (Tr. 28). She noted that Dr. Montasir did not find any physical problems other than the alleged back pain (Tr. 28). The ALJ noted that Plaintiff failed to fill prescriptions for psychotropic medication (Tr. 29). She cited June, 2014 records showing that Plaintiff showed improvement when taking psychotropic medication (Tr. 30). She noted that despite Plaintiff's allegations of disability as of August, 2012, she was able to attend college classes for another year (Tr. 31). The ALJ noted that in August, 2013, Plaintiff requested a "return to work" letter because "not working was making her more depressed" (Tr. 31). The ALJ noted that Plaintiff appeared to limit her work activity to less than 20 hours a week for the primary purpose of remaining eligible for disability benefits (Tr. 31).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at

step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four arguments for remand. First, she faults the ALJ's finding that the failure to take psychotropic medication as directed undermined the claims of a disabling mental condition. *Plaintiff's Brief,* 5-9, *Docket #11,* Pg ID 529. On a related note, she argues second that the ALJ failed to consider the full impact of the mental limitations in crafting the RFC. *Id.* at 9-11. Third, she claims that the transcript does not contain a medical opinion supporting the RFC for exertionally light work. *Plaintiff's Brief* at 12-13. Finally, she contends that the ALJ neglected to provide a "function-by-function" discussion of the physical and mental capabilities to support the physical RFC. *Id.* at 13-15.

Arguments one and two will be considered separately. Arguments three and four, pertaining chiefly to Plaintiff's allegations of physical limitation, can be discussed in tandem.

### A. Plaintiff's Failure to Fill Psychotropic Medication Prescriptions

Plaintiff faults the ALJ's determination that the failure to fill prescriptions for psychotropic medication undermined the disability claim. *Plaintiff's Brief* at 6-9. She argues that the ALJ did not consider whether the failure to follow through with the prescribed treatment was in fact, attributable to mental illness. *Id.* (*citing Mittlestadt v. CSS,* 2011 WL 2694594 (W.D. Wash. June 15, 2011)(failure to comply with medical advice can be

symptomatic of mental illness).

Plaintiff is correct that under SSR 96–7p, 1996 WL 374186, *7 (July 2, 1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."[6] *See also* SSR 82–59, 1982 WL 31384, *4 (1982)(The ALJ must consider an individual's claim that she is unable to afford the prescribed treatment).

However here, the ALJ did not err in concluding that the non-compliance with medical advice undermined rather than supported the claims of disabling mental illness. The ALJ noted that the record as a whole (even during the periods Plaintiff did not take medication) pointed to less than disabling psychological problems. The ALJ cited June, 2012 treating records stating that Plaintiff's "priorities" were maintaining her hair and using money (budgeted for other things) on "junk food" (Tr. 29). The ALJ cited the 2013 treating records showing that Plaintiff self-medicated with marijuana (Tr. 29). She noted that Plaintiff did not stop taking college classes until the summer of 2013 and that she continued to look for work long after the alleged onset of disability date (Tr. 29-30). The ALJ observed that Plaintiff's work activity during the period under consideration was deliberately limited

---

[6]While SSR 96-7p was superseded by SSR 16-3p in March, 2016, SSR 96-7p applies to the current decision, issued in 2014.

to less than 20 hours a week for the primary purpose of maintaining eligibility for disability benefits (Tr. 29-31). The ALJ noted that Plaintiff's daily activities included driving her daughter to school, washing laundry, cooking, and baking cakes (Tr. 31). Plaintiff's reliance on *Mittlestadt*, *supra,* for the proposition that the failure to fill the psychotropic medication prescriptions was attributable to mental illness is inapplicable here. In *Mittlestadt,* the argument that medical non-compliance was due to mental illness was supported by a treating physician's opinion. *Id.* at *8-9. The *Mittlestadt* court remanded the case to the administrative level based on the ALJ's mis-reading of the treating mental health source opinion. *Id.* In contrast here, none of the mental health sources stated that Plaintiff was disabled from all work, much less found that her non-compliance with medical advice was due to mental illness. Notably, her treating sources encouraged her to obtain employment: in December, 2013, she was told to attend a job fair and in July, 2014, given a "return to work" day of July 19, 2014 (Tr. 393, 453).

The ALJ's conclusion that Plaintiff's failure to comply with medical advice was attributable to lack of disability rather than mental health problems is well supported by the record. Accordingly, the deference regularly accorded an ALJ's credibility determination is appropriate. *See Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination entitled to deference); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record' ").

### B. The Mental RFC

On a related note, Plaintiff argues, in effect, that the psychological restrictions found in the RFC do not account for her full degree of mental limitation. *Plaintiff's Brief* at 9-11.

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996). The analysis must include the non-exertional limitations. 20 C.F.R. § 404.1545. The ALJ must consider how the non-exertional limitations effect the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p at *6.

In regard to the mental limitations, the RFC limited Plaintiff to occasional interaction with coworkers and supervisors; no interaction with the general public; a preclusion on "team or tandem duties with coworkers; and "low-stress environments such that would allow her to maintain control over the pace of the work" (Tr. 27).

Plaintiff's argument that the ALJ's choice of psychological limitations was not well supported or articulated is not well taken. The ALJ noted that her finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace was drawn directly from Drs. Moten's and Leno's findings (Tr. 31, 99, 111). Plaintiff asserts that "neither Dr. Moten nor Dr. Leno

addressed . . . [her] ability to understand, carry out, and remember instruction; use judgment . . .; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting," as required by 96-8p at *6. *Plaintiff's Brief* at 10. However, her contention is directly contradicted by Dr. Moten's findings regarding exactly these factors in her April, 2013 analysis (Tr. 114-115). In turn, the ALJ adopted these findings, noting that she accorded "great weight" to Dr. Moten's finding that Plaintiff experienced both mild and moderate work-related psychological limitations (Tr. 31).

Plaintiff's argument that the ALJ did not otherwise provide an adequate rationale for the mental RFC unavailing. The ALJ noted that while Dr. Boneff found that Plaintiff could follow up to three-step tasks and work at a sustained pace, the ALJ found that Plaintiff was additionally limited by the need to "work at her own pace because of . . . problems becoming easily irritated and angry" (Tr. 31). As discussed above, the ALJ found that Plaintiff's activities of daily living, including the ability to attend college and work part time undermined the claim that she was unable to perform even a limited range of unskilled work. Plaintiff's claim that the ALJ was required to provide a more detailed rationale of the limitations found in the RFC should be rejected. "'Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v. Commissioner of Social Sec.*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. CSS*, 251 F.3d 153, slip op., 4 (Table)(3rd Cir. December 19, 2000)(punctuation added). " '[T]he ALJ need only articulate

how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo at slip op.* at 5). Because the mental RFC is well supported and explained, a remand on this basis is unwarranted.

### C. Arguments Regarding the Physical Conditions

Plaintiff argues next that the RFC for a range of light work is unsupported by a any medical opinion. *Plaintiff's Brief* at 12-13. This argument is wholly erroneous. While she asserts that "the record is devoid of any RFC assessment from any physicians whatsoever," *Id.* at 12, the physical RFC found in the administrative opinion is drawn directly from Dr. Ahmed's June, 2013 finding that Plaintiff could perform a range of exertionally light work (Tr. 128-129). Moreover, the ALJ stated explicitly that the physical RFC was drawn directly from Dr. Ahmed's findings (Tr. 31). My own review indicates that the RFC is consistent with Dr. Ahmed's conclusions. Thus, Plaintiff's third argument reflects a misreading of both the transcript and the administrative opinion.

For overlapping reasons, Plaintiff's contention that the ALJ did not provide a sufficient rational for the physical RFC does not provide grounds for remand. Under SSR 96-8p, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* The analysis of the physical functions must include the exertional activities of "sitting, standing, walking, lifting,

carrying, pushing, [and] pulling" as well as the non-exertional limitations. 20 C.F.R. § 404.1545. However, the ALJ's rational for the physical RFC is adequately explained. She noted that the finding that Plaintiff could perform a limited range of light work was supported by Dr. Ahmed's findings (Tr. 31). She observed that Plaintiff exaggerated her physical limitations, citing a report that she could walk for half of a mile and her denial of physical health concerns to her mental health treaters (Tr. 31).

Finally, Plaintiff throws in a three-sentence argument at the end of this section, contending that the VE's testimony did not reflect her limitations as a result of bipolar disorder, mood disorder, borderline personality disorder, dysthymic disorder, and impulse control disorder. *Plaintiff's Brief* at 14-15. However, the undeveloped claim of errors in the vocational testimony does not provide grounds for remand. First, the ALJ's choice of modifiers used in the hypothetical question to the VE (modifiers mirrored in the ultimate RFC) are supported by substantial evidence consisting of Drs. Moten's and Leno's findings and more restrictive limitations based on the treating records showing some limitation resulting from an anger management disorder (Tr. (Tr. 31, 85, 99, 111, 127). Second, Plaintiff's apparent belief that the ALJ was required to include all of her mental diagnoses in the hypothetical question to the VE has been rejected by the Sixth Circuit. *Webb v. Commissioner of Social Sec.,* 368 F.3d 629, 633 (6th Cir. 2004)(hypothetical questions to VE's need not "include lists of claimants' medical conditions" so long as it reflects their relevant work-related limitations). Likewise, Plaintiff's apparent contention that the ALJ

was required to adopt all her claimed but unsupported limitations in the question to the VE is without merit. *See Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118–119 (6th Cir. 1994) (ALJ not obliged to include discredited claims in question to VE).

The ALJ's finding that Plaintiff was capable of a limited range of unskilled, exertionally light work is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level. As such, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #12] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #11] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: April 30, 2017

## CERTIFICATE OF SERVICE

I hereby certify on April 30, 2017, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants.

s/Carolyn Ciesla
Case Manager to
Magistrate Judge R. Steven Whalen